1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY DUNN and DANNY DUNN,<br><br>Plaintiffs,<br><br>vs.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, in its own name and as Receiver for IndyMac Bank, F.S.B.; DOES 1 through 10,<br><br>Defendants. | CASE NO. CV 08-06652 MMM (AJWx)<br><br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A). That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it. The FDIC made deposit insurance determinations for accounts held at IndyMac and notified depositors of the determinations via letter. Some depositors, including plaintiffs, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

The parties filed opening briefs on November 30, 2009,[1] and responding briefs on December 21, 2009.[2]  Following the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") on July 21, 2010, the parties submitted supplemental briefing regarding the FDIC's revised deposit insurance determinations for Dunn's accounts.[3]

## I.  FINDINGS OF FACT

### A.    The Accounts

1.      Plaintiff Larry Dunn had three accounts with IndyMac prior to July 11, 2008.[4]

2.      Prior to July 11, 2008, account XXXXXX5064 had a balance of $54,736.70, account XXXXXX5073 had a balance of $109,504.01, and account XXXXXX9144 had a balance of $108,733.47.[5]  The funds deposited in the three accounts thus totaled $272,974.18.[6]

---

[1]Plaintiffs' Opening Brief ("Pls.' Brief"), Docket No. 25 (Nov. 30, 2009); Defendant Federal Deposit Insurance Corporation's Opening Trial Brief ("FDIC's Brief"), Docket No. 26, (Nov. 30, 2009).  On December 4, 2009, the parties stipulated that the court could consider certain documents in deciding the issue before it; they did not stipulate that such documents could be included in and augment the administrative record.  (Joint Stipulation and Order to Allow the Court to Consider Attached Documents in Deciding the Issue Before it Under 5 U.S.C. § 607 ("Supp. Docs."), Docket No. 30 (Dec. 10, 2009).)

[2]Plaintiffs' Reply Brief; Request for Oral Argument ("Pls.' Reply"), Docket No. 33 (Dec. 21, 2009); Defendant Federal Deposit Insurance Corporation's Response Trial Brief ("FDIC's Reply"), Docket No. 32 (Dec. 21, 2009).

[3]Brief Filed By Plaintiffs ("Plaintiffs' Supp. Brief"), Docket No. 45 (Nov. 9, 2010); Plaintiffs' Reply Brief ("Plaintiffs' Supp. Reply"), Docket No. 47 (Nov. 23, 2010); Brief Filed By Defendant FDIC ("FDIC's Supp. Brief"), Docket No. 46 (Nov. 9, 2010); Response Filed by Defendant FDIC ("FDIC's Supp. Reply"), Docket No. 48 (Nov. 23, 2010).  The FDIC also submitted a supplemental administrative record.  (See Declaration of Belinda Davis Attaching Supplemental Administrative Record ("Davis Decl."), Docket No. 44 (Oct. 26, 2010).

[4]Declaration of Deon King Attaching Administrative Record ("King Decl."), Docket No. 17 (June 9, 2009), ¶¶ 2-3; Exh. A.

[5]Id., ¶ 5, Exh. A.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (Id., ¶ 4 n. 2. See also Declaration of

3.      All three accounts – Nos. XXXXXX5064, XXXXXX5073, and XXXXXX9144 – were single ownership accounts.[7]

**B.      The FDIC's Recovery of IndyMac Data**

4.      Before IndyMac Bank closed, the FDIC requested deposit account records maintained by the computer deposit system at IndyMac Bank. The FDIC requested approximately 45 data fields for each deposit account along with electronic copies of trial balances, deposit application reconciliations, and the general ledger of the bank. The FDIC requested this data in advance of IndyMac Bank's closure to test delivery capabilities, prove the balancing and reconciliation processes, and make certain that all required data fields had been included.[8]

5.      As a result, from March 20 to July 18, 2008, FDIC employees transferred files from the computers of IndyMac Bank to those of the FDIC. Prior to IndyMac Bank's closure, the FDIC's technical staff worked with the bank to verify the accuracy of the data so that the files provided to the FDIC could be processed properly. The FDIC verified the sum of the current balance and accrued interest data fields. It also checked data against the bank's general ledger to ensure that it received all deposit products.[9]

6.      Subsequently, the FDIC transferred the computerized deposit account records of IndyMac Bank to its Receivership Liability System ("RLS"). This process involved three types of files maintained at IndyMac Bank:

a.      The "Deposit.csv" file, known as the "Deposit File," a database of deposit

---

Victor Villarreal ("Villarreal Decl."), Docket No. 35 (May 25, 2010), ¶ 3.) Victor Villarreal is a Lead Information Technology Specialist at the FDIC who personally assisted in transferring electronic deposit account records maintained by IndyMac Bank to the FDIC's program for processing deposit insurance, known as the Receivership Liability System ("RLS"). (*Id.*, ¶ 1.)

[6]King Decl., ¶ 4; Villarreal Decl., Exh. A.

[7]King Decl., ¶ 3; Villarreal Decl., Exh. A.

[8]Villarreal Decl., ¶ 3.

[9]*Id.*, ¶ 5.

accounts;

    b.    The "CIF.csv" file, known as the "Customer Information File," a database of all customers; and

    c.    The "DIF_CIF.csv" file, known as the "CIF Joint File," which maps customers and their relationships to deposit accounts.[10]

7.    Combining information from the Deposit File and the Customer Information File, the FDIC created an account title in the RLS for each IndyMac Bank deposit account. The Deposit and Customer Information files provided the account number, the owner or owners of each account, the "relationship code" for the names on the account, the then-current deposit balance, the accrued interest, and the date the account was opened, among other information.[11]

8.    The "relationship code" is a code included in IndyMac Bank's Customer Information File that described the relationship between the account owner or owners and other names on the account, including beneficiaries. Names and relationship codes in the Customer Information File were used to create the account title for each account loaded into the RLS. These codes included:

    a.    "BNI," which stands for "beneficiary – individual trust," i.e., a beneficiary of a revocable trust account held by a single owner;

    b.    "BNJ," which stands for "beneficiary – joint trust," i.e., a beneficiary of a revocable trust account held by multiple owners;

    c.    "JBO," which stands for "joint owner with a beneficiary," i.e., a joint revocable trust account;

    d.    "JTO," which stands for 'joint owner," i.e., a joint ownership account;

    e.    "SLB," which stands for "sole owner with beneficiary," i.e., a beneficiary of a revocable trust account;

---

[10] *Id.*, ¶ 6.

[11] *Id.*

f.     "SOL," which stands for "individual owner," i.e., a single ownership account;

g.     "TRS," which stands for "trustee," i.e., funds held by a bank pursuant to an irrevocable trust account; and

h.     "TST," which stands for "trust," i.e., a formal revocable trust account.[12]

9.     The Customer Information File also uses the following acronyms:

a.     "AFT" means "as trustee for";

b.     "ITF" means "in trust for"; and

c.     "POD" means "payable-on-death to."[13]

10.    On July 11, 2008, after the FDIC closed out the day's business so that it could determine end-of-day account balances, it processed IndyMac Bank's deposit data for use in the RLS.[14]  Using all of the data previously described, as uploaded from IndyMac Bank's deposit records, the RLS grouped depositors based on name, address, and tax identification number to produce a "Final Grouping Report."  The report lists the accounts owned by an individual depositor, the account balances in those accounts, and the account numbers.  If there are uninsured or potentially uninsured funds, the RLS also produces an "XX/PH Worksheet" for use by FDIC Claims Agents.[15]  The Final Grouping Report and the XX/PH Worksheet are reviewed by FDIC Claim Agents to approve a deposit insurance determination.  Once that determination is finalized, the RLS produces a Notice of Allowance of Claim and a Receivership Certificate for the uninsured balances.[16]

11.    In response to the court's order requiring the FDIC to augment the administrative record

---

[12]*Id.*, ¶ 9.

[13]*Id.*, ¶ 10.

[14]*Id.*, ¶ 7.

[15]The abbreviation "XX" refers to "excess" or uninsured balances.  The abbreviation "PH" refers to "pass with hold" for potentially uninsured balances that require further review.  (*Id.*, ¶ 12.)

[16]*Id.*

to provide source information, the FDIC submitted the information obtained from IndyMac Bank for Dunn's accounts that was used to populate the RLS.  These records show the account numbers, the owners, the relationship code for the names on the accounts, the then-current deposit balance, the accrued interest, and the date the account was opened.[17]

## C.    The FDIC's Insurance Determination

12.    The FDIC as receiver for IndyMac assigned Deon King to review deposit insurance coverage and claims arising out of IndyMac's failure.  King reviewed the three accounts at issue in this case.[18]

13.    On August 12, 2008, King finalized the insurance determination for Dunn's accounts, and concluded that under the deposit insurance rules codified at 12 C.F.R. § 330.10, Dunn was the sole owner of the three accounts.  A total of $272,974.18 was deposited in the accounts.  King determined that $100,000.00 of Dunn's total account balance of $272,974.l8 was insured.[19]

14.    On August 12, 2008, the FDIC sent Dunn a Notice of Allowance of Claim and Receivership Certificate in the amount of $172,974.18.[20]

15.    Based on the FDIC's calculation that disposition of IndyMac's assets would result in recovery of approximately 50% of the uninsured deposits of IndyMac, the FDIC also sent Dunn a 50% advance dividend of $86,487.09.[21]

16.    On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. No.1 I 1-203, became law.  Section 335 of the Dodd-Frank Act amended the Federal Deposit Insurance Act, 12 U.S.C. § 182 I (a)(1 )(E), by making

---

[17]Villarreal Decl., ¶ 14, Exh. A.

[18]King Decl., ¶ 2.

[19]*Id.*, ¶ 4, Exh. A.

[20]*Id.*, ¶ 6.

[21]*Id.*, ¶ 7.

the increase in the standard maximum deposit insurance amount ("SMDIA") from $100,000.00 to $250,000.00 permanent and retroactive to January 1, 2008. Section 335 also requires that, in applying the $250,000.00 deposit insurance amount retroactively to January 1, 2008, the FDIC subtract: (1) deposit insurance previously paid to depositors by the FDIC, and (2) payments (such as dividends) previously made to depositors by the FDIC Receiver.[22]

17.   Immediately following the enactment of the Dodd-Frank Act, the FDIC made the increased deposit insurance amounts available to IndyMac Bank depositors with uninsured deposit balances.[23]  In determining the amount due, the FDIC applied the Dodd-Frank Act using the information on which it had based its final deposit insurance determination following the bank's closure in 2008.[24]  That information included each depositor's account balance as of July 11, 2008, the amount of insurance provided to each depositor, the amount of any Receivership Certificates sent to depositors, and the amount of the 50% advance dividend paid to depositors.[25]

18.   As a result of the Dodd-Frank Act, Dunn's accounts were insured to $250,000.00 instead of $100,000.00.[26]  To satisfy statutory requirements, the FDIC subtracted the amounts Dunn had previously received – the deposit insurance payment of $100,000.00 and the advance dividend of $86,487.11 – from the maximum retroactive deposit insurance limit of $250,000.00.  The difference between the monies paid to Dunn and the retroactive insurance was $63,512.89.[27]  The FDIC sent Dunn a check for $63,512.89 and a revised

---

[22]Davis Decl., ¶ 3.

[23]*Id.*, ¶ 4.

[24]*Id.*

[25]*Id.* Exh. B, C (FDIC's record of payments made to plaintiffs, including Receivership Certificates and dividends).

[26]*Id.*, ¶ 6.

[27]*Id.*, ¶ 7.

1   Receivership Certificate dated July 30, 2010, for the remaining uninsured deposit balance
2   of $22,974.18.[28]

3

4                              **II.   CONCLUSIONS OF LAW**

5       **A.      Standard of Review**

6   19.   The FDIC's determination of insurance coverage is governed by the Federal Deposit
7         Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

8   20.   The FDIC's final determination "regarding any claim for insurance coverage [is] a final
9         agency action reviewable in accordance with" the Administrative Procedure Act ("APA").
10        12 U.S.C. § 1821(f)(4).   Under the APA, the court examines whether the FDIC's decision
11        was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with
12        law." 5 U.S.C. § 706(2)(A).   The parties agree that the relevant question the court must
13        answer is whether the FDIC's action was arbitrary or capricious.[29]

14  21.   Final agency action is arbitrary and capricious if the agency "'has relied on factors which
15        Congress has not intended it to consider, entirely failed to consider an important aspect of
16        the problem, offered an explanation for its decision that runs counter to the evidence before
17        the agency, or is so implausible that it could not be ascribed to a difference in view or the
18        product of agency expertise.'"   *O'Keeffe's Inc. v. U.S. Consumer Product Safety*
19        *Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers'*
20        *Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

21  22.   A district court is limited to a review of the reasoning on which the agency relied in
22        making its decision. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007)
23        (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).   It can "uphold a decision of less
24        than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicles*
25        *Manufacturers' Association*, 463 U.S. at 43.   Where an agency offers an "interpretation

─────────────────────

26

27   [28]*Id.*, ¶ 7, Exh. C.

28   [29]Pls.' Brief at 4; FDIC's Brief at 3.

                                         8

of its own regulation [that] reflects its considered views," even if those views are developed in response to litigation and communicated in a legal brief, the court should accept the interpretation if convinced it is not "merely a *post hoc* rationalization." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007). See also *Alaska v. Federal Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir. 2008) ("While we may not fabricate a rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43). "'Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Northwest Coalition for Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544 F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43).

23.   "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted.'" *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir. 2009) (quoting *Long Island Care at Home*, 551 U.S. at 171). See also *Long Island Care at Home*, 551 U.S. at 170-71 ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation alone presents no separate ground for disregarding the Department's present interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir. 2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)). "In other words, we must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1131 (9th Cir. 2003) ("When the meaning of regulatory language is ambiguous, the

1   agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so

2   long as the interpretation sensibly conforms to the purpose and wording of the

3   regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission*, 499

4   U.S. 144, 150-51 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries*

5   *Service*, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations

6   it is charged with administering is entitled to a high degree of deference and will be upheld

7   as long as it is not plainly erroneous or inconsistent with the regulation").

8   **B.      Supplementation of the Record**

9   24.   Although judicial review of an agency's decision under 5 U.S.C. § 706 is typically

10        confined to the administrative record, courts have crafted narrow exceptions to this rule.

11        See, e.g., *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("In limited

12        circumstances, district courts are permitted to admit extra-record evidence: (1) if admission

13        is necessary to determine 'whether the agency has considered all relevant factors and has

14        explained its decision,' (2) if 'the agency has relied on documents not in the record,'

15        (3) 'when supplementing the record is necessary to explain technical terms or complex

16        subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.' These limited

17        exceptions operate to identify and plug holes in the administrative record. Though widely

18        accepted, these exceptions are narrowly construed and applied" (citations omitted)).

19   25.   The Ninth Circuit has held that "[t]he 'whole' administrative record [ ] consists of all

20        documents and materials directly *or indirectly* considered by agency decision-makers and

21        includes evidence contrary to the agency's position." *Thompson v. United States*

22        *Department of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal quotation marks and

23        citation omitted).

24   26.   When a reviewing court finds it necessary to look outside the administrative record to

25        evaluate whether an agency has considered all relevant factors and adequately explained

26        its decision, it should obtain additional explanations of agency action from the agency

27        itself. *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) ("If . . . there was such failure to

28        explain administrative action as to frustrate effective judicial review, the remedy was not

to hold a *de novo* hearing but, as contemplated by [*Citizens to Preserve*] *Overton Park* [*v. Volpe*, 401 U.S. 402 (1971)], to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary"); see also, e.g., *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (quoting *Camp*). In such instances, "[t]he court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision." *Id.* (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)).

27.  By contrast, where it appears that the agency has relied on documents not included in the administrative record, "supplementation is appropriate." *Portland Audubon Society*, 984 F.2d at 1548. In such instances, "the crux of the analysis is whether the documents or materials [that a party requests be added to the administrative record] were actually considered, directly or indirectly, by the agency decisionmakers." *Pacific Coast Federation of Fishermen's Association/Institute for Fisheries Resources v. Gutierrez*, No. 1:06-CV-00245 OWW LJO, 2007 WL 1752287, *2 (E.D. Cal. June 15, 2007) (citing *Thompson*, 885 F.2d at 555).

28.  The FDIC's deposit insurance determinations are governed by regulations set forth in 12 C.F.R. § 330. These regulations state that "deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).[30] Regulations providing for the recognition of deposit ownership and fiduciary relationships note that, except under circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume

---

[30]The term excludes "account statements, deposit slips, items deposited or cancelled checks." 12 C.F.R. § 330.1(e).

that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1).[31] Significantly, there is no mention of the RLS in the FDIC's governing regulations.

29. The administrative record attached to the King declaration did not contain copies of relevant bank records that must be reviewed to evaluate whether the FDIC's determination was arbitrary and capricious or an abuse of discretion. Indeed, the only record attached was the XX/PH Worksheet produced by the RLS. Because this document was insufficient to establish ownership of the account, the court could not definitively determine the records or other information on which the FDIC relied in making the insurance determination.

30. Indeed, after reviewing the XX/Ph Worksheet produced by the RLS, it appeared clear that the FDIC had relied indirectly on some other document or documents in compiling the information in the RLS. The parties stipulated that the court could consider certain additional documents, including: (1) the FDIC's responses to interrogatories;[32] (2) the FDIC's response to plaintiffs' request for production of documents;[33] (3) the RLS records

---

[31]The provision further states:

"If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be considered binding on the depositor, and the FDIC shall consider no other records on the manner in which the funds are owned. If the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned. Despite the general requirements of this paragraph (a)(1), if the FDIC has reason to believe that the insured depository institution's deposit account records misrepresent the actual ownership of deposited funds and such misrepresentation would increase deposit insurance coverage, the FDIC may consider all available evidence and pay claims for insured deposits on the basis of the actual rather than the misrepresented ownership." 12 C.F.R. § 330.5(a)(1).

[32]Joint Stipulation and [Proposed] Order to Allow the Court to Consider Documents in Deciding the Issue Before It Under 5 U.S.C. § 706 ("Supp Docs."), Docket No. 27 (Dec. 4, 2009) at 3-30.

[33]Supp. Docs. at 34-44.

12

for accounts XXXXXX5064, XXXXXX5073, and XXXXXX9144;[34] (4) an FDIC callback form;[35] (5) a depositor interview form;[36] (6) a printout of a screen-shot that is too blurry to discern its contents;[37] (7) a January 24, 2009 account balance statement for account XXXXXX5064;[38] (8) a January 24, 2009 account balance statement for account XXXXXX9144;[39] (9) a January 24, 2009 account balance statement for account XXXXXX5073;[40] (10) an additional printout of a screen-shot that is too blurry to discern its contents;[41] and (11) a letter from the FDIC to plaintiffs' counsel stating that after a diligent search, no further documents could be found concerning the accounts at issue.[42] The parties did not stipulate, however, that these documents could be included in the administrative record.

31. Although the court concluded that "supplementation [was] appropriate" because it appeared that the FDIC had relied on documents not included in the administrative record, *Portland Audubon Society*, 984 F.2d at 1548, this does not permit the court to consider documents in plaintiffs' possession that were not part of the administrative record. See *Lands Council*, 395 F.3d at 1029 (noting that plaintiffs' "enthusiastic argument pressing evidence that the [agency may not have] consider[ed] stands at odds with the norms of administrative law and typical judicial review of agency action"). See also *Federal Power Commission*

---

[34]*Id.* at 46-47.

[35]*Id.* at 48.

[36]*Id.* at 49.

[37]*Id.* at 50-59.

[38]*Id.* at 60.

[39]*Id.* at 61.

[40]*Id.* at 62.

[41]*Id.* at 64-66.

[42]*Id.* at 57-58.

1    *v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) ("[T]he focal point

2    for judicial review [must] be the administrative record already in existence, not some new

3    record made initially in the reviewing court" (internal citation and quotation marks

4    omitted)); *Southwest Center for Biological Diversity v. United States Forest Service*, 100

5    F.3d 1443, 1450 (9th Cir. 1996) ("Judicial review of an agency decision typically focuses

6    on the administrative record in existence at the time of the decision and does not encompass

7    any part of the record that is made initially in the reviewing court"); *Center for Biological*

8    *Diversity v. U.S. Bureau of Land Management*, No. C-06-4884-SI, 2007 WL 3049869, *3

9    (N.D. Cal. Oct. 18, 2007) ("Judicial review of the agency action must be based on the

10   whole administrative record, which includes everything that was before the agency

11   pertaining to the merits of its decision").  As a consequence, on January 25, 2010, the

12   court issued an order declining to consider the documents that were the subject of the

13   parties' stipulation on the basis that they were extra-record evidence.

14   32.   "The [administrative] record[, however,] is not necessarily those documents that the

15         agency has compiled and submitted as the administrative record; the court must look to all

16         the evidence that was before the decision-making body."  *Public Power Council v.*

17         *Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (internal citations and quotations marks

18         omitted).  See also *Thompson*, 885 F.2d at 555-56 ("[t]he . . . administrative record . . .

19         consists of all documents and materials directly or *indirectly* considered by agency

20         decision-makers and includes evidence contrary to the agency's position" (emphasis

21         original)).  Furthermore, if, after considering the administrative record, the court finds that

22         the agency's rationale is not sufficiently explained, it can "obtain from the agency . . . such

23         additional explanation of the reasons for the agency decision as may prove necessary."

24         *Camp*, 411 U.S. at 142-43.  See also *City and County of San Francisco v. United States*,

25         930 F.Supp. 1348, 1355-56 (N.D. Cal. 1996) ("When the administrative record so fails

26         to explain agency action that judicial review of that action is effectively frustrated, the

27         court may 'obtain from the agency, either through affidavits or testimony, such additional

28         reasons for the agency decision as may prove necessary.' . . .  Similarly, the court may

14

1    inquire outside of the administrative record 'when it appears the agency has relied on

2    documents or materials not included in the record,'" quoting *Camp*, 411 U.S. at 143).

33.    In this case, because it appeared that "the agency ha[d] relied on documents not in the record," the court on May 25, 2010 concluded *sua sponte* that supplementation of the record was needed "to determine whether the agency ha[d] considered all relevant factors and explained its decision." Cf. *Home Box Office*, 567 F.2d at 52 (court *sua sponte* ordered the Federal Communications Commission to provide "a list of all of the *ex parte* presentations, together with the details of each, made to it, or any of its members or representatives, during the rulemaking proceedings").

34.    It directed the FDIC to produce: (1) evidence in the form of declarations or documents explaining how the information in the RLS concerning Dunn's accounts was populated; (2) any documents that would augment the record in that they were documents upon which the FDIC indirectly relied because they constituted the source information for the data input into the RLS; and (3) evidence in the form of declarations or otherwise explaining any technical terms or abbreviations included in the RLS or the documents produced pursuant to this order. The court noted that the supplementation it sought should be comprised of records of the type enumerated in 12 C.F.R. § 330.1(e) upon which the FDIC relied in reaching its final deposit insurance determination, as well as any other information which the FDIC, in its discretion, had gathered and considered concerning Dunn's accounts prior to the date the insurance determination was made (e.g., communications between the FDIC and Dunn or between the FDIC and IndyMac employees). Cf. 12 C.F.R. § 330.5(a)(1). In particular, the court sought evidence as to whether the RLS, upon which the FDIC's insurance determination was based, and which itself is not an IndyMac deposit account record, relied on and/or summarized documents not included in the administrative record filed with the court.

35.    In response to the court's order requiring supplementation of the administrative record, the FDIC filed the Villarreal declaration, which (1) explains the methodology by which the RLS database was populated from deposit account records maintained by IndyMac Bank;

(2) attaches IndyMac Bank deposit account records reflecting the deposit balance and nature of Dunn's accounts at IndyMac Bank; and (3) explains all technical terms and abbreviations used both in the RLS and the IndyMac Bank source information.  It is clear from the Villarreal declaration that this source information is data upon which the FDIC indirectly relied in reaching its insurance determination.

**C.     Whether the FDIC Properly Determined the Ownership of the Accounts**

36.   The FDIC's deposit insurance determinations are governed by the regulations set forth in 12 C.F.R. Part 330.   As noted, regulations concerning the recognition of deposit ownership and fiduciary relationships state that, except in circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1).  See also *Villafane-Neriz v. F.D.I.C.*, 75 F.3d 727, 731 (1st Cir. 1996) (holding that the FDIC "is entitled to rely exclusively on the account records of the failed institution," and that "while ownership under state law is one prerequisite for insurance coverage, the deposit account records are controlling").  "Deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).  Under this definition, IndyMac Bank's computerized data was a deposit account record on which the FDIC was entitled to rely.

37.   At the time IndyMac closed, single owner accounts were insured up to $100,000.00. Single owner accounts are deposit accounts owned by one natural person and titled in that person's name only.  If an owner held more than one account, the funds in the accounts had to be aggregated for purposes of applying the $100,000.00 insurance limit. 12 C.F.R. § 330.6(a) (2008).

38.   Here, as noted, Dunn's accounts were all sole owner accounts.  King determined that

16

account XXXXXX5064 had a balance of $54,736.70, account XXXXXX5073 had a balance of $109,504.01, and account XXXXXX9144 had a balance of $108,733.47. The funds deposited in the three accounts thus totaled $272,974.18. King properly applied the $100,000.00 of insurance available to the outstanding balance and concluded that the accounts contained uninsured funds of $172,974.18.[43]

39.    The FDIC's final insurance determination regarding the accounts was in accordance with the law and supported by the type of evidence upon which FDIC was required to rely.

**D.    Whether the FDIC Properly Applied the Dodd-Frank Act**

40.    "Section 335 of the [Dodd-Frank Act] retroactively increases the standard maximum deposit insurance amount from $100,000[.00] to $250,000[.00] for depositors in any institution for which, as here, the FDIC was appointed as receiver between January 1, 2008, and October 3, 2008." *Sunflower Bank, N.A. v. F.D.I.C.*, No. 09-4006-SAC, 2010 WL 3913597, *2 n. 4 (D. Kan. Sept. 30, 2010), citing Pub.L. No. 111-203.

41.    Section 335 of the Dodd-Frank Act requires that "any payment on a deposit claim made by the [FDIC] as receiver. . . to a depositor above the standard maximum deposit insurance amount in effect at the time of the appointment of the [FDIC] as receiver. . . shall be deemed to be part of the net amount due to the depositor under." 12 U.S.C. § 1821(a)(l)(B); Pub. L. No. 111-203, § 335,124 Stat. 1376 (July 21, 2010) (amending 12 U.S.C. § 1821(a)(l)(E)).

---

[43]King Decl., ¶¶ 3-4, 6. Plaintiffs assert that the FDIC should have found that the three accounts were joint ownership accounts, based on signature cards they gave the FDIC. Plaintiffs' reliance on the signature cards is misplaced. First, the signature cards are contradictory, as they contain, on the one hand, typed account information establishing the accounts as single ownership accounts, and handwritten account information indicating that they were joint ownership accounts. More fundamentally, the signature cards were not in the records of IndyMac Bank, and therefore are not deposit account records maintained at the insured depository institution; so long as these are unambiguous, they are the only records on which the FDIC can rely. See 12 C.F.R. § 330.5(a)(1). Given the mandatory nature of the regulations, the fact that the FDIC declined to consider records provided by the depositor but not found in the bank's files does not render its insurance determination arbitrary or capricious. See 12 U.S.C. § 1821(f)(4); 5 U.S.C. § 706(2)(A).

42.   Following passage of the Dodd-Frank Act, on September 23, 2010, the court directed the FDIC to file a supplemental administrative record regarding its new deposit insurance determination.   In response, the FDIC filed the Davis declaration, which explains the methodology the FDIC used to arrive at its revised deposit insurance determination.   It also attaches IndyMac Bank deposit account records reflecting the deposit balance and nature of Dunn's accounts at IndyMac Bank.   The exhibits to the declaration are clearly the source information upon which the FDIC relied in reaching its insurance determination.   See *Thompson*, 885 F.2d at 555 ("[t]he 'whole' administrative record [ ] consists of all documents and materials directly *or indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position" (internal quotation marks and citation omitted)).   See also *City and County of San Francisco*, 930 F.Supp. at 1355-56 ("When the administrative record so fails to explain agency action that judicial review of that action is effectively frustrated, the court may 'obtain from the agency, either through affidavits or testimony, such additional reasons for the agency decision as may prove necessary.' . . . Similarly, the court may inquire outside of the administrative record 'when it appears the agency has relied on documents or materials not included in the record,'" quoting *Camp*, 411 U.S. at 143)).

43.   Based on the information in the FDIC's records, under Dodd-Frank, when the SMDIA increased from $100,000.00 to $250,000.00, Dunn became eligible for deposit insurance of $250,000.00.   The original administrative record shows that accounts Nos. XXXXXX5064, XXXXXX5073, and XXXXXX9144, all of which were single ownership accounts in the name of "Larry I. Dunn," had an original aggregate balance of $272,974.18.   Documents in the supplemental administrative record show that, following the bank's closure, Dunn received deposit insurance of $100,000.00 and an advance dividend of $86,487.11.   The FDIC subtracted these amounts from the retroactive deposit insurance of $250,000.00 as required by the Dodd-Frank Act.   Accordingly, Dunn was entitled to additional insurance of $63,512.89 and a revised Receivership Certificate of

$22,974.18.[44]

44.   The FDIC's final deposit insurance determination regarding Dunn's accounts was thus in accordance with the law and supported by the evidence upon which the FDIC was required to rely. See 5 U.S.C. § 706(2)(A); *O'Keeffe's Inc.*, 92 F.3d at 942.  See also *Elizabeth v. Federal Deposit Ins. Corp.*, No. CV 08-6028 PA (JWJx), 2010 WL 1266826, *6 (C.D. Cal. Mar. 28, 2010) ("The FDIC's determination that Plaintiff held a total of $113,105.15 in revocable trust accounts with Mr. Oswalt as a beneficiary, which was $13,105.15 over the deposit insurance limit, was not arbitrary or capricious or otherwise not in accordance with the law, and was a determination made within the FDIC's sole discretion.   The FDIC's determination that $13,105.15 of the deposit balances in Plaintiff's Account Nos. 9098, 9100, 9119, and 9128 was considered uninsured is therefore in accordance with law and supported by the evidence upon which the FDIC is entitled to rely," citing 5 U.S.C. § 706(2)(A).

---

[44]*Id.*, Exh. D.  Plaintiffs dispute the FDIC's application of the Dodd-Frank Act, asserting that they should receive additional insurance of $75,000 on every $250,000 in retroactive deposit insurance for which they qualify.  (Plaintiffs' Supp. Brief at 2-3; Plaintiffs' Supp. Reply at 4.)  They suggest that the FDIC's interpretation penalizes depositors with account balances greater than $250,000.00, and is therefore arbitrary.   (Plaintiffs' Supp. Reply at 4-5.)   Plaintiffs' argument ignores the clear language of the act, which requires that, in applying the $250,000.00 deposit insurance amount retroactively to January 1, 2008, the FDIC subtract: (1) deposit insurance previously paid to the depositor by the FDIC, and (2) amounts such as dividends previously paid to depositors by the FDIC Receiver.  See Pub. L. No. 111-203, § 335,124 Stat. 1376 (July 21, 2010) (amending 12 U.S.C. § 1821(a)(1)(E)).  Because depositors whose account balances exceeded $250,000.00 received a dividend equivalent to 50% of their uninsured deposits, subtracting the value of the dividend from the new deposit insurance maximum may result in certain depositors receiving only a small amount of additional insurance or no additional insurance at all.  This is because such depositors have already received a dividend equivalent to all or the majority of additional insurance available after Dodd-Frank.  Such a result is mandated by the plain language of the act, and the FDIC's calculation is not arbitrary or capricious as a result.

**III. CONCLUSION**

For the reasons stated, the court finds that plaintiffs are not entitled to recover further insurance for Larry Dunn's single ownership accounts from the FDIC.

DATED: May 31, 2012

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE